# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 08-CR-1332-CJW-MAR |
| vs. | |
| KIRK ANDERSON, | MEMORANDUM OPINION & ORDER |
| Defendant. | |

## I. INTRODUCTION

This matter is before the Court on defendant's motion for compassionate release and for relief under Section 404 of the First Step Act ("FSA") filed on July 21, 2020. (Docs. 116 & 117). On August 6, 2020, the government timely filed a resistance. (Doc. 118). On August 21, 2020, defendant timely filed a reply. (Doc. 121). For the following reasons, the Court **grants in part** and **denies in part** defendant's motion.

The Court will first address whether compassionate release is warranted before considering relief under the FSA.

## II. RELEVANT BACKGROUND

Between 1996 and 1997, defendant conspired with others to distribute cocaine base. (Doc. 66, at 32). Defendant obtained marijuana, cocaine, and cocaine base from Chicago, Illinois for distribution in Dubuque, Iowa. (*Id.*). Defendant would either sell these substances personally or direct others to sell them on his behalf. (*Id.*). Despite being arrested on December 18, 1996, for his part in the distribution scheme, defendant continued to direct others to sell drugs from jail via phone. (*Id.*). On November 12, 1997, defendant was sentenced to 180 months' imprisonment followed by eight years on

supervised release. (*Id.*). On December 11, 1998, his term of incarceration was amended to 144 months. (*Id.*). On June 13, 2006, defendant was released from prison and began his term of supervised release. (*Id.*, at 33).

Upon release, defendant immediately became involved in a conspiracy to obtain, cut, package, and distribute "large amounts" of cocaine base and marijuana in Dubuque despite being under federal supervision. (*Id.*, at 8–10). Defendant gradually took on a supervisory role in the conspiracy. (*Id.*, at 11). Defendant's responsibilities included overseeing the delivery of the cocaine, which included renting cars and enlisting female drivers with valid licenses, and collecting the funds derived from distribution. (*Id.*, at 11–12). For his work, defendant was paid $2,000 a month and sometimes a small amount of cocaine. (*Id.*, at 11). Defendant was sometimes present when the cocaine base was converted into smokable rock form and, on occasion, provided a motel room for the operation. (*Id.*, at 14). Defendant's co-conspirators maintained stash houses around Dubuque which housed drugs, money, and as many as 12 firearms. (*Id.*, at 15). The firearms were used to beat and threaten drug dealers if they fell behind on their payments. (*Id.*). Defendant was present for such beatings at least twice. (*Id.*). In early 2007, the Court modified defendant's supervised release and ordered him to serve three consecutive weekends in jail after he tested positive for cocaine. (*Id.*, at 33). Twice in October 2007, a confidential informant ("CI") called defendant to purchase cocaine base. (*Id.*, at 15). Defendant referred the CI to B.H., who then sold the CI cocaine base from his residence near a school. (*Id.*). Defendant supplied the cocaine base to B.H. (*Id.*). Even while hospitalized in December 2007, defendant continued to direct the sale of drugs. (*Id.*, at 16). In total, defendant was responsible for the distribution of 3,628.8 grams of marijuana, 15,349.23 grams of cocaine, and 40,618.55 grams of cocaine base, all while on supervised release with this Court. (*Id.*).

On December 17, 2008, a grand jury issued an Indictment charging defendant with two counts of distributing cocaine base within 1,000 feet of a school and one count of conspiracy to distribute cocaine base within 1,000 feet of a school in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), 841(b)(1)(C), 846, 851, and 860. (Doc. 1). On December 19 or 20, 2007, defendant was arrested. (Docs. 5; 66, at 17). On January 2, 2008, the Court revoked defendant's supervised released and sentenced him to 12 months' imprisonment. (Doc. 66, at 17). On January 8, 2009, defendant pled not guilty and was detained. (Doc. 12).[1] On March 25, 2009, defendant pled guilty to the conspiracy charge under a plea agreement with the government. (Docs. 46 & 46–1). On April 9, 2009, the Court accepted defendant's plea. (Doc. 49).

On November 19, 2009, the United States Probation Office filed defendant's second revised final presentence investigation report. (Doc. 66). Defendant was, at that time, 47 years old. (*Id.*, at 2). Defendant reported that he never knew his father but, on prior occasions, defendant stated his father was a veteran who died around 1970. (*Id.*, at 39). Defendant described his mother as a heroin addict. (*Id.*). At age 5, defendant began residing with other family members due to his mother's drug abuse. (*Id.*). His mother died of a drug overdose when he was approximately 16 years old. (*Id.*). Two of defendant's eight half-siblings had drug-related criminal histories. (*Id.*). Defendant was a member of a gang from 1974 to 2006. (*Id.*, at 41). Defendant dropped out of school in eighth grade but later earned his GED as well as some college credits while incarcerated. (*Id.*, at 47–48).

Defendant reported that he was in a relationship with his "common law wife" from 1980 until her death in 1993. (*Id.*, at 40). Defendant's daughter from this relationship

---

[1] The Court granted defendant's motion to proceed pro se during his prosecution, but defendant regained counsel at some point during the process. *See* (Docs. 23, 25, & 26).

lived with her grandmother following the death of her mother. (*Id.*). Defendant was married from 1997 to 2003. (*Id.*). He reported his wife abused cocaine and had a history of forgery and drug-related convictions. (*Id.*). In 2006, defendant began a relationship with another woman, with whom he had one child. (*Id.*, at 40–41). Defendant reported that he was not ordered to pay child support for either of his children, but records reflect he was in arrears as to both children, one in excess of $34,000. (*Id.*, at 41). While not incarcerated, defendant held consistent but largely episodic employment. (*Id.*, at 48–49). At his most recent job, he was terminated in part for falsely verifying the hours of persons ordered to complete community service. (*Id.*, at 48).

Defendant had undergone many operations and medical tests related to his ulcerative colitis. (*Id.*, at 42–43). Defendant often experienced nausea, vomiting, bowel obstruction, abdominal pain, and other side effects from his condition. (*Id.*). Defendant reported that his condition may eventually develop into "stomach cancer." (*Id.*, at 43). Defendant reported that he was not suffering from any mental health issues, although he was diagnosed in the past with depression, personality disorder, antisocial personality disorder, and adjustment disorder. (*Id.*, at 44). Defendant attempted suicide in 1992 while in the Dubuque County Jail. (*Id.*). He contemplated suicide in 2007 and admitted himself to a psychiatric unit as a result. (*Id.*). In 2008, defendant again contemplated suicide and reported hearing auditory hallucinations of "positive remarks." (*Id.*, at 45). Defendant reported long running and heavy use of alcohol, marijuana, and cocaine. (*Id.*, at 45–46). Defendant used these substances at times daily over the course of decades. (*Id.*). Defendant was diagnosed with cocaine and cannabis abuse. (*Id.*, at 46). Nevertheless, he did not believe his histories with any of these substances was problematic. (*Id.*, at 45–46). Defendant also abused heroin on occasion and "tac." (*Id.*, at 46). Defendant had undergone multiple drug treatment programs, including the Bureau

4

of Prisons' ("BOP") Residential Drug Abuse Treatment Program and was diagnosed with moderate marijuana and cocaine dependence. (*Id.*, at 46–47).

Defendant's criminal history was substantial. At age 24, he was convicted of possession with intent to deliver cocaine and was sentenced to two years' probation. (*Id.*, at 24). Defendant violated his probation twice and was given a two-year prison sentence but was paroled after five months. (*Id.*, at 24–25). One of defendant's probation violations was his conviction for theft at age 27, which involved defendant damaging and stealing a car and fleeing from police. (*Id.*, at 25). At age 29, defendant was convicted of disorderly conduct. (*Id.*, at 26). Also at age 29, defendant was convicted of assault causing bodily injury for grabbing, pushing, choking, and slapping his common law wife as well as threatening her with a gun. (*Id.*, at 27). At age 30, defendant was convicted of two counts of delivery of a cocaine within 1,000 feet of a park and sentenced to ten years in prison but was paroled after three years. (*Id.*, at 28). Defendant was also convicted of extortion for entering a woman's residence and threatening her and her son with a gun to allow his friends to reside at the house. (*Id.*, at 30). While on bond for that offense, defendant was arrested for threatening another person with a gun. (*Id.*). Defendant was also convicted of theft for presenting false checks at a casino. (*Id.*). Defendant failed to pay more than $6,000 in fines and restitution. (*Id.*). At age 34, only about four months after being released from prison for his prior offenses, defendant was convicted of conspiracy to distribute cocaine, the offense for which he was on supervised release at the time of his instant offense. (*Id.*, at 32).

On November 23, 2009, the Court sentenced defendant. (Doc. 69). Defendant was a career offender in criminal history category VI with a total offense level of 42, yielding an advisory guideline range of 360 months to life imprisonment followed by ten years on supervised release. (Doc. 66, at 24). The Court sentenced him to 360 months'

5

imprisonment followed by ten years on supervised release. (Doc. 70). Defendant did not appeal his sentence.

On April 2, 2012, defendant filed a pro se motion to reconsider his sentence. (Doc. 81). That same day, the Court denied his motion. (Doc. 82). On July 6, 2015, the Court, on its own motion, found a reduction in defendant's sentence was not appropriate in light of changes to the United States Sentencing Guidelines ("USSG"). (Doc. 93). On June 29, 2017, defendant filed a pro se motion to appoint counsel. (Doc. 96). On July 3, 2017, the Court denied his motion. (Doc. 97). On July 24, 2017, defendant appealed the Court's denial of his motion. (Doc. 98). On September 6, 2017, the Eighth Circuit Court of Appeals affirmed. (Doc. 102).

On June 9, 2020, defendant filed a pro se motion for compassionate release (Doc. 106) which he later supplemented (Docs. 107, 110, 111, & 113). On June 16, 2020, the Court appointed defendant counsel. (Doc. 108). On July 21, 2020, defendant filed his motion for compassionate release and relief under the FSA now before the Court. (Docs. 116 & 117). Defendant is currently incarcerated at Forrest City Low FCI with a projected release date of August 9, 2034.[2]

### III. COMPASSIONATE RELEASE

#### A. Applicable Law

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [Bureau of Prisons ("BOP")] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden

---

[2] *Find an Inmate*, BOP, https://www.bop.gov/inmateloc/.

of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Although some courts disagree, this Court holds that defendants are not required to administratively appeal a warden's denial and may satisfy Section 3582(c)(1)(A) by waiting 30 days from the date the warden receives their request before filing a motion for compassionate release in the courts. *United States v. Burnside*, 467 F. Supp. 3d 659, 667 (N.D. Iowa 2020) (compiling cases).

The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [Bureau of Prisons] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

United States Sentencing Guidelines ("USSG") Section 1B1.13 defines "extraordinary and compelling reasons" as used in Section 3582(c)(1)(A)(i). Section 1B1.13 provides that such reasons exist when the defendant is (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physical or mental deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75

7

percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; or (5) is experiencing some other extraordinary and compelling reason as determined by the BOP. Although some courts disagree, this Court holds that Section 1B1.13 is not binding because it predates the First Step Act of 2018's amendments to Section 3582(c)(1)(A) which enabled defendants to bring motions for compassionate release on their own behalf. *United States v. Crandall*, No. 89-CR-21-CJW-MAR, 2020 WL 7080309, at *5 (N.D. Iowa Dec. 3, 2020). The Court recognizes, however, that Section 1B1.13 should still be considered a helpful guidepost in determining whether extraordinary and compelling reasons exist to release a defendant. *Id.*

### *B.* *Analysis*

#### *1.* *Exhaustion of Administrative Remedies*

On April 23, 2020, defendant submitted a request for release to the warden of his facility. (Doc. 110, at 66). On May 6, 2020, the warden denied his request. (*Id.*, at 65). On May 13, 2020, defendant submitted a second request to the warden. (*Id.*, at 69). On May 19, 2020, the warden again denied defendant's request. (Doc. 117–1, at 5). Because 30 days have lapsed since defendant submitted both his requests to the warden, the Court finds he has fulfilled the exhaustion requirement. *See Burnside*, 467 F. Supp. 3d at 667.

#### *2.* *Extraordinary and Compelling Reason*

Defendant argues an extraordinary and compelling reason for release is present because his health conditions put him at a high risk of severe complications and death if exposed to COVID-19. (Doc. 117, at 11–13). Defendant notes that he "either suffers from, or has a history of, . . . ulcerative colitis; total colectomy; coronary artery disease; esophageal reflux; hypertension; irritable bowel syndrome (IBS); anemia; bronchitis;

8

schizoaffective disorder; and spinal degeneration." (*Id.*, at 11). Defendant offers the opinion of Dr. Mary Montgomery, an instructor at Harvard Medical School and a physician at Brigham and Women's Hospital. (Doc. 117–1, at 244–63). Dr. Montgomery concludes defendant's "ulcerative colitis, heart disease, hypertension and [history] of bronchitis" put him "at a heightened risk of complications from COVID-19." (*Id.*, at 247). Dr. Montgomery emphasized that ulcerative colitis often requires immunosuppressant medications and that defendant had a heart attack in 2017. (*Id.*, at 245, 247). Defendant highlights his high blood pressure readings and argues the BOP is not providing him prompt treatment. (Doc. 117, at 12). Currently, Forrest City Low FCI has around 164 active COVID-19 cases among its inmates, 23 active cases among its staff, and 604 recovered cases.[3] No inmates or staff at the facility have died from COVID-19. *Id.*

The presence of COVID-19 at a defendant's facility or within the BOP generally can constitute an extraordinary and compelling reason for compassionate release if the defendant is particularly susceptible to COVID-19 due to their age or underlying health conditions. *See Burnside*, 467 F. Supp. 3d at 668 (compiling cases). The Centers for Disease Control and Prevention ("CDC") recognizes that persons with coronary artery disease or chronic bronchitis are at increased risk during the pandemic.[4] Hypertension and prolonged use of corticosteroids may increase a person's risk. *Id.* Further, the CDC holds that a person's risk increases with their age.[5] The CDC also notes that eight out of

---

[3] *COVID-19*, BOP, https://www.bop.gov/coronavirus/.

[4] *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (Dec. 29, 2020).

[5] *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (Dec. 13, 2020).

ten deaths related to COVID-19 in the United States have been in persons older than age 65 and that persons over age 85 are at the greatest risk. *Id.*

Defendant is 58 years old. (Doc. 66, at 2). Thus, although the Court notes defendant's age, he is not in a high-risk age group.

Defendant's esophageal reflux disease, anemia, and spinal degeneration are not listed by the CDC as being relevant to COVID-19. Although significant mental health problems may be relevant, *see United States v. Falls*, No. 14-CR-74 CJW-MAR, 2020 WL 4193271, at *5–6 (N.D. Iowa July 21, 2020),[6] defendant's schizoaffective disorder does not appear to be significant. Indeed, it is not discussed other than being listed as current in 2008 and in remission in 2018. (Doc. 117–1, at 218). Moreover, although defendant has a history of bronchitis (*Id.*, at 217), his most recent respiration was normal and showed no signs of bronchitis (*Id.*, at 204). Only chronic bronchitis is regarded as a risk factor by the CDC. Thus, the Court affords defendant's esophageal reflux disease, anemia, spinal degeneration, and schizoaffective disorder little weight in its analysis and his history of bronchitis minimal weight.

Defendant has long suffered from bowel-related health issues. (*Id.*, at 42–44). Although his bowel-related conditions are significant, even requiring surgery in the past, they are not listed by the CDC as increasing his risk during the pandemic. *See, e.g.*, *United States v. Brik*, No. 15-cr-78 (SRN/BRT), 2020 WL 3531576, at *6 (D. Minn. June 30, 2020) (irritable bowel syndrome); *United States v. Bartlett*, No. 06-CR-273, 2020 WL 3077940, at *5 (E.D. Wis. June 9, 2020) (ulcerative colitis). The only relevance these conditions may have is the extent to which defendant uses corticosteroids to treat them. Defendant was prescribed a corticosteroid, i.e. prednisone, in March 2020.

---

[6] *Stress and Coping*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/stress-coping/index.html (Dec. 16, 2020) (noting the potential impact of mental health conditions on chronic physical health conditions).

(Doc. 117–1, at 194-95). Only prolonged use, however, is significant according to the CDC. The Court has no basis to conclude defendant's use of prednisone has been prolonged; he was only prescribed it on one occasion. Further, even if it was prolonged, his use of this medication at best "may" increase his risk. Thus, the Court affords defendant's bowel-related health issues minimal weight.

Coronary artery disease is an identified risk factor by the CDC. Other than his heart attack three years ago and some high blood pressure, defendant's cardiovascular health is otherwise stable. (*Id.*, at 204–05) (noting his cardiovascular health as within normal limits and having normal rate and rhythm in January 2020). The record also states at least twice that defendant does not have a history of heart disease or coronary artery disease. (*Id.*, at 77, 122) (noting no history of heart disease or "CAD"). Although his blood pressure readings are somewhat high (*Id.*, at 209), he receives medication for this condition (*Id.*, at 206). Moreover, this condition is only a potential risk factor for COVID-19. Although defendant is apparently not receiving blood pressure readings as frequently as was previously ordered, the record indicates he receives a reading approximately every two to three months. (*Id.*, at 209). This treatment schedule appears to adequately control his condition. Overall, despite his coronary artery disease and hypertension, defendant's cardiovascular health concerns appear to be relatively minor. Thus, the Court affords these conditions significant but not substantial weight.

On balance, the Court finds defendant has not presented an extraordinary and compelling reason for release. He has identified, at best, one condition which increases his risk (coronary artery disease) and two conditions which may increase his risk (use of corticosteroids and hypertension). None of these conditions appear to be particularly serious at this time. Thus, the Court finds release inappropriate based on defendant's health conditions despite the pandemic. The Court will, however, independently examine

11

the Section 3553(a) factors in the alternative as if defendant had presented an extraordinary and compelling reason for release.

### 3. *Section 3553(a) Factors*

Defendant argues the Section 3553(a) factors favor release. (Doc. 117, at 13–16). Although he acknowledges his underlying offense is serious, he notes he did not personally possess any firearms or engage in assaultive behavior. (*Id.*, at 14). Defendant also highlights his substantial rehabilitative efforts, minor disciplinary history, mitigating personal history, and decreased risk of recidivism due to his age, maturity, and family circumstances. (*Id.*, at 14–16).

Guideline Section 1B1.13(2) provides compassionate release is appropriate only when "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider the factors set forth in Title 18, United States Code, Section 3553(a) before granting compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

The Court commends defendant's significant rehabilitative efforts, which he has exhaustively documented in letters to the Court. *See, e.g.*, (Docs. 50, 65, 68, 71, 73, 75, 76, 78, 83, 84, 91, 92, & 95). He has completed, among other things, educational courses, personal wellness classes, degree programs, and drug treatment programs. (Doc. 117–1, at 1–4). He has also worked as a tutor, suicide companion, and food

12

service employee. (*Id.*). Indeed, his disciplinary reports are few, far between, and minor. (*Id.*, at 264). Defendant has also served approximately 12 years of his sentence. Defendant also has a promising release plan, a job awaiting him if released, and a broad support system as indicated by his letter of support. (*Id.*, at 265–70).

That said, given defendant's history, the Court cannot find that supervised release will be sufficient to deter defendant from engaging in further criminal activity or protect the community at this time. His criminal history is replete with drug-related criminal activity, violence, and a disregard for the law and the safety of others. Defendant was convicted at age 30 of delivery of cocaine within 1,000 feet of a park, his second drug-related conviction. Months after being released, he joined a drug distribution conspiracy in his mid-30's. Defendant was so dedicated to furthering this conspiracy that he continued to direct its operations from jail. He spent approximately ten years in federal prison for this offense. Despite being under federal supervision, defendant immediately returned to the exact same criminal conduct in his mid-40's. He continued to direct the conspiracy even while hospitalized. Although there is no evidence that he personally used firearms or employed violence during the conspiracy, he was complicit in these activities in order to collect drug money. At no time did his increasing age, familial responsibilities, or prior incarceration deter him. Although he has some mitigating factors during his upbringing, his childhood has long been behind him.

In short, defendant's progress while incarcerated does not warrant a nearly 14-year reduction in his sentence to time served given his recidivist and severe criminal history. Relying on the time defendant has already served, even amid the pandemic, would fail to promote respect for the law, provide just punishment, and provide deterrence to defendant and others similarly situated. Thus, the Court finds that the Sections 3553(a) factors weigh against release.

In light of these findings, defendant's motion for compassionate release is **denied**. The Court will next examine whether a reduction is appropriate under the FSA.

## IV. FIRST STEP ACT

### A. Applicable Law

Congress enacted the FSA on December 21, 2018. The statute was part of a compressive criminal justice reform package and makes numerous changes to the criminal code, including reducing some mandatory minimum sentences, changing other sentencing ranges, and changing how compassionate release motions are filed. Section 404, the only portion of the FSA that is retroactive, provides that a court may "impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 were in effect at the time the covered offense was committed." *Id*. § 404(b); *see also* 18 U.S.C. § 3582(c)(1)(B). The FSA defines a "covered offense" as any crime which had its penalties modified by Sections 2 or 3 of the Fair Sentencing Act of 2010. *Id*. § 404(a). Section 2 of the Fair Sentencing Act modified the statutory penalties for certain violations of Title 21, United States Code, Section 841(b) related to cocaine, effectively reducing the penalty applicable to a qualifying defendant. *See United States v. McDonald*, 944 F.3d 769, 771 (8th Cir. 2019). District courts have broad discretion in determining whether to reduce a defendant's sentence on a covered offense under the FSA. *See, e.g.*, *United States v. Williams*, 943 F.3d 841, 844 (8th Cir. 2019).

### B. Analysis

There is no dispute that defendant was convicted of a covered offense and is thus eligible for a sentence reduction under the FSA. (Docs. 117, at 4; 118, at 26). At the time of sentencing, defendant's applicable statutory penalties were a mandatory minimum sentence of 20 years' imprisonment and a maximum sentence of life imprisonment followed by ten years on supervised release. 21 U.S.C. §§ 841(b)(1)(A), 851. Had the FSA been in effect, defendant's applicable statutory penalties would have been a ten-year

14

mandatory minimum sentence and a maximum sentence of life imprisonment followed by eight years on supervised release. *Id.* at §§ 841(b)(1)(B), 851. The parties only dispute is whether the Court should exercise its discretion to reduce defendant's term of incarceration.

The Court first notes that defendant received a sentence of 360 months' imprisonment, significantly above the then-applicable mandatory minimum sentence of 20 years' imprisonment. The parties also agree that the FSA would not affect defendant's advisory guideline range; 360 months to life imprisonment. (Docs. 118, at 27; 121, at 8). Thus, the fact that his mandatory minimum sentence would have been different under the FSA would likely have been immaterial.

Setting these issues aside, however, and looking purely at whether a reduction is warranted here in light of defendant's rehabilitation, the Section 3553(a) factors, and other relevant considerations, the Court finds that a sentence reduction is inappropriate. The Court's analysis of the Section 3553(a) factors above applies here as well. Defendant has long been involved in distributing large quantities of multiple drugs. He has persisted in this conduct into his adulthood despite his prior terms of incarceration or placement on federal supervision. Defendant held a supervisory role in the drug conspiracy, which he knew involved the use of firearms and violence even if he himself did not participate. Although defendant's upbringing, addiction issues, and strides toward rehabilitation are all mitigating, defendant has had many opportunities in the past to reform. At every turn, he has betrayed the Court's trust and returned, sometimes almost immediately, to the same, aggravating criminal conduct. The Court cannot, looking at the instant offense and defendant's criminal history, find that a lesser term of incarceration than what defendant received is appropriate. The Court hopes, however, that defendant will continue his efforts toward rehabilitation, accrue further credit towards his sentence, and

ultimately come out on supervised release prepared to conform to the law at the conclusion of his term of incarceration.

A reduction in defendant's term of supervised release, however, is appropriate. The Court sentenced defendant to ten years' supervised release, the bottom of the range at the time of sentencing. Now, the bottom of his range would be eight years. Thus, a reduction would be consistent with the sentencing judge's intent. The government also does not resist such a reduction. (Doc. 118, at 30). Setting these considerations aside, a reduction in defendant's term of supervised release would give him some warranted credit for his performance while incarcerated without significantly sacrificing the safety of the community or risking recidivism.

## V. CONCLUSION

For these reasons, defendant's motion for compassionate release or relief under Section 404 of the FSA (Doc. 116) is **granted in part** and **denied in part**.

Defendant's motion for compassionate release is **denied**. Defendant's motion for a reduction of his term of incarceration under Section 404 of the FSA is **denied**. Defendant's motion for a reduction in his term of supervised release under Section 404 of the FSA is **granted**. Defendant's term of supervised release following his term of incarceration is reduced from ten years to eight years. All other terms of the Court's judgment remain unchanged. (Doc. 70).[7]

**IT IS SO ORDERED** this 7th day of January, 2021.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

---

[7] To the extent defendant's pro se motion (Doc. 106) is not superseded by his current motion, the Court **denies** it for the same reasons outlined here.